**Hubert A. HACKNEY, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 10048.**

District of Columbia Court of Appeals.

Argued Sept. 23, 1977.

Decided July 3, 1978.

Rehearing En Banc Denied
Sept. 19, 1978.

---

Robert L. Weinberg, Washington, D. C., appointed by this court, with whom Charles S. Robb and Leona Marx, Washington, D. C., were on the briefs, for appellant.

Robert Fabrikant, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Daniel J. Bernstein and Mary H. Weiss, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KELLY, NEBEKER and YEAGLEY, Associate Judges.

KELLY, Associate Judge:

Appellant Hackney appeals from judgments of conviction of two counts of first-degree murder, D.C.Code 1973, § 22-2401, which resulted in concurrent sentences of life imprisonment. Four of the issues raised require discussion:[1] viz., (1) whether the trial court properly denied appellant's motion to dismiss the indictment for lack of jurisdiction; (2) whether the first-degree murder counts of the indictment were defective for want of an allegation of specific intent to kill; (3) whether the trial court properly instructed the jury on aiding and abetting; and (4) whether the trial court erred in denying appellant's motion for severance of the homicide counts. Finding no reversible error, we affirm.

I

During five weeks in 1973, four persons were brutally murdered. These murders began with the killing of Charles D. Coleman by Willie Strickland[2] and Michael White because Coleman had robbed White of some narcotics. Coleman's bullet-ridden body was discovered on January 16, in Rock Creek Park, on a private roadway off Park Road, N.W. Michael White was then stabbed to death because he refused to kill his girl friend, Brenda Green-el, who Strickland feared would implicate him in the Coleman murder. White's hands and face were also burned. His charred remains were found on January 30, in a garage on Clifton Street, N.W. The two remaining murder victims were killed because they made inquiry concerning the whereabouts of White. The dead body of Theodore J. Moore was recovered in a ditch about a mile south of The Plains, Virginia, on February 13. The following day Yale D. Harris was found dead in an alley off 18th Street, N.W.

One Jesse Martin was arrested for murder on May 1, 1973, after police identified his thumbprint on a note found on Moore's body. Confronted with this evidence, Martin made several statements to the police implicating Willie Strickland in all four homicides and appellant in three of the killings.[3] He admitted, as well, his participation in the final two murders. Appellant and Strickland were subsequently arrested and brought to trial.[4]

II

The indictment against Strickland and Hackney was returned in the Superior

---

1. Other assigned errors are that the trial court denied: (1) cross-examination of a key government witness about his residence addresses, (2) a motion to suppress that witness' trial testimony, and (3) a motion to suppress certain evidence seized pursuant to a warrant. We do not find appellant's arguments to be compelling with regard to these issues.

2. See Strickland v. United States, D.C.App., 389 A.2d 1325 (Nos. 9342 & 10014, decided this day).

3. Martin pleaded guilty to two charges of second-degree murder (D.C.Code 1973, § 22-2403), which were lesser included offenses un-

der two first-degree murder counts in the indictment. Martin testified as a government witness at the trials of both appellant and Strickland. Appellant was charged with having committed three murders but was acquitted by the jury on the charge of killing Michael White. In a separate trial, however, Willie Strickland was found guilty of White's murder.

4. A jury trial commenced in February 1974, but at Strickland's request a mistrial was declared after the prejudicial opening statement of appellant's attorney. In June, a severance of defendants was granted. Appellant's second trial began in April 1975, concluding when the jury returned a verdict of guilty of two counts of

Court by the grand jury of the United States District Court. Both men thereafter filed motions in the trial court seeking dismissal of the indictments on the ground that the grand jury which returned them lacked jurisdiction to do so. The trial court disagreed.

At the outset, we note that D.C.Code 1973, § 11–1903(a) provides:

A grand jury serving in the District of Columbia may take cognizance of all matters brought before it regardless of whether an indictment is returnable in the Federal or District of Columbia Courts.

■ The Code provision was expressly held to pass constitutional muster by our decision in *Atkinson v. United States,* D.C. App., 295 A.2d 899 (1972). Appellant nevertheless attempts to avoid the statute's effect by arguing that it permits a grand jury only to "take cognizance" of a matter ultimately proper before another court, but not to return an indictment with respect to such matters. The trial court found, and we agree, that this reading of the statute is overly literal and we therefore find it unpersuasive.[5]

■ Alternatively, appellant argues that the holding in *Atkinson v. United States, supra,* should be construed to apply only to cases which arose during the transitional phase of court reorganization. He reasons that since the transfer of all local criminal jurisdiction to Superior Court has been completed, the transfer taking place long before the return of appellant's indictment, there is no longer any need for using this indictment procedure. Furthermore, he contends that a construction of the statute by this court which would allow an Article I

court's grand jury to return indictments to an Article III district court, and vice versa, could create "serious constitutional doubts." In this context, appellant relies heavily on *Palmore v. United States,* 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973). In *Palmore,* the constitutional existence of the Superior Court as an Article I felony court for the District of Columbia, was sustained on the rationale that Congress, with the enactment of the Court Reform Act,[6] had created two entirely separate court systems for the District of Columbia under two separate Articles of the Constitution.

Here, Congress reorganized the court system in the District of Columbia and established one set of courts in the District with Art. III characteristics and devoted to matters of national concern. It also created a wholly separate court system designed primarily to concern itself with local law and to serve as a local court system for a large metropolitan area. [*Palmore v. United States, supra* at 408, 93 S.Ct. at 1681.]

While *Palmore v. United States, supra,* has analogized the District of Columbia Court system to the judicial system of a state, it is not so for all purposes. *See Pernell v. Southall Realty,* 416 U.S. 363, 368 n. 4, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974). Federal courts as well as the District of Columbia courts were created by Congress. Both administer laws enacted by Congress. The prosecution of criminal offenses in both courts is by the United States Attorney and the grand juries in both courts derive their responsibilities from the Constitution. A judge is an Article III judge depending upon his responsibilities and upon the presence or absence of life tenure and an immunity from diminution of compensation. *Cf.*

first-degree murder, not guilty on one count of first-degree murder, and not guilty of carrying a dangerous weapon.

5. The trial court pointed out:
The Advisory Committee comment to Rule 6 of the Rules of Criminal Procedure of this Court states that "This Rule recognizes that a grand jury summoned by the Superior

Court may return indictments in either the Superior Court or the United States District Court. . . ."

6. District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L.No. 91–358. D.C.Code 1973, § 11–101 *et seq.*

*Glidden Company v. Zdanok,* 370 U.S. 530, 552, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962). No such qualifications or attributes attach to grand jurors. The trial court took judicial notice of the fact that grand jurors for both the District Court and the Superior Court are selected from the same pool of names, by the same jury commissioners, by use of the Superior Court computer, and pursuant to an identical method. Moreover, the grand jurors in the two courts have identical qualifications and it is only by chance that a person may be selected to serve on one grand jury rather than the other. The grand jury procedure is virtually identical in both courts. *See Atkinson v. United States, supra* at 901.

Hence, there is no constitutional impediment to a congressional decision [D.C.Code 1973, § 11–1903(a)], to permit grand juries attached to either court to return indictments both for violations of a federal or local criminal statute. Therefore, we find no error in the trial court's denial of appellant's motion to dismiss the indictment for lack of jurisdiction.

### III

Appellant contends that the trial court erred in refusing to dismiss counts III, IV, and VII of the indictment, or in the alternative to construe these counts as charging murder in the second degree. Counts III, IV, and VII of the indictment alleged that Hackney purposely beat, stabbed, shot or strangled various victims, thereby causing injuries from which these victims died. It is appellant's position that the indictment did not charge first-degree murder because it alleged a purpose or intent to beat, stab,

shoot or strangle rather than, as the statute requires, a purpose or intent to kill.[7]

The trial court based its refusal to dismiss the disputed counts of the indictment on two seventy-year-old precedents which hold that an indictment charging first-degree murder pursuant to statute (D.C.Code 1901, § 798, the predecessor of D.C.Code 1973, § 22–2401) was not defective for want of an express allegation of an intent to kill. *Burge v. United States,* 26 App.D.C. 524 (1906); *Hamilton v. United States,* 26 App. D.C. 382 (1905). Appellant disputes the continuing validity of those holdings in light of later authorities and Super.Ct.Cr.R. 7(c).

██ Assuming the merit of appellant's argument, which the government vigorously protests, Super.Ct.Cr.R. 7(c) requires that an indictment be a plain, concise, and definite statement of the essential facts constituting the offense charged. Additionally, an indictment must state the charged offense and its elements with clarity sufficient to allow the defendant to prepare his defense and avoid future prosecution for the same offense. *Nichols v. United States,* D.C.App., 343 A.2d 336 (1975); *United States v. Pendergrast,* D.C.App., 313 A.2d 103 (1973). *See Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.E.2d 590 (1974). These requirements implement the constitutional rights to be informed of the nature and cause of an accusation, to be tried only on a grand jury's charge, and to be free from being twice placed in jeopardy. *See United States v. Radetsky,* 535 F.2d 556, 562 (10th Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976); *United States v. Trotta,* 525 F.2d 1096, 1099 (2d

---

**7.** D.C.Code 1973, § 22–2401 provides:

Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or by means of poison, or in perpetrating or attempting to perpetrate any offense punishable by imprisonment in the penitentiary, or without purpose so to do kills another in perpetrating or in attempting to perpetrate any arson, as defined in section 22–401, or 22–402, rape, mayhem, robbery, or kidnap-

ping, or in perpetrating or attempting to perpetrate any housebreaking while armed with or using a dangerous weapon, is guilty of murder in the first degree.

The word "purposely" has been construed as being synonymous with "specific intent." *United States v. Sutton,* 138 U.S.App.D.C. 208, 426 F.2d 1202 (1969); *Collazo v. United States,* 90 U.S.App.D.C. 241, 196 F.2d 573, *cert. denied,* 343 U.S. 968, 72 S.Ct. 1065, 96 L.Ed. 1364 (1952).

Cir. 1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); *United States v. Briggs,* 514 F.2d 794, 804–806 (5th Cir. 1975). In this instance, citing *United States v. Owens,* D.C.App., 332 A.2d 752 (1975), and Rule 7(c), appellant argues that since specific intent is an element of murder in the first degree, and the indictment in the instant case alleged no specific intent to kill, the indictment is deficient.

■■■■ Although we said in *United States v. Owens, supra,* that the essential elements of the crime charged should be alleged in an indictment, the underlying rationale for this holding was to satisfy the constitutional requirement that a defendant be apprised of what he must be prepared to meet. *United States v. Owens, supra* at 753. *See Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). *See also United States v. Pendergrast, supra* at 104. Indeed, one scholar has suggested that the essential element requirement should be read in light of whether it is fair to the defendant to require him to defend on the basis of the charge stated in the indictment. *See* 1 C. Wright, Federal Practice and Procedure § 125, at 233–34 (1969). Hence, although the indictment in question is not a model of proper criminal pleading, we do not believe its imperfections are prejudicial.[8] It does not contain an allegation of specific intent to kill. Its sufficiency must be determined, however, by practical rather than technical considerations. *Robbins v. United States,* 476 F.2d 26 (10th Cir. 1973). Courts generally give an indictment a common sense construction, *see United States v. Anderson,* 532 F.2d 1218, 1222 (9th Cir. 1976); *United States v. Arteaga-Limones,* 529 F.2d 1183, 1188 (5th Cir. 1976), and dismiss challenges based on technical inaccuracies or omissions, if the indictment adequately informs the defendant of pending charges. *See United States*

*v. Vento,* 533 F.2d 838, 870–71 & n. 116 (3d Cir. 1976); *United States v. Morrison,* 531 F.2d 1089, 1093–94 (1st Cir. 1976); *United States v. Blanton,* 531 F.2d 442, 443–44 (10th Cir. 1975), *cert. denied,* 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976). The gravamen of the charge here is a violation of D.C.Code 1973, § 22–2401. This was sufficient to fairly notify appellant of the charges against him. Moreover, counsel for appellant was aware throughout the proceedings that his client was charged with first-degree murder. No prejudice appearing, such an omission furnishes no ground for finding the indictment defective.

## IV

Appellant also contends that the trial court's charge to the jury on aiding and abetting permitted him to be convicted of first-degree murder without a finding of premeditation and deliberation on his part. The essence of appellant's position is that in a first-degree context, an aider and abettor must entertain the same *mens rea* as the principal. This reading of the law is not completely accurate. As stated in Perkins, Criminal Law (2d ed. 1969) at 662:

> In general it is the abettor's state of mind rather than the state of mind of the perpetrator which determines the abettor's guilt or innocence, except that he is chargeable even with a specific intent if he gives his aid or encouragement knowing the other is acting with such an intent. If the charge is first degree murder based upon an alleged deliberate and premeditated killing, the abettor is not guilty of this degree of the crime unless he either acted upon a premeditated design to cause the death of the deceased *or knew that the perpetrator was acting with such an intent,* and the same may be said of assault with intent to kill. [Emphasis added; footnotes omitted.]

---

**8.** We have been assured by counsel at oral argument that this form of first-degree murder indictment has not been used by the government since the instant indictment was returned in Superior Court. We therefore stress the fact that our holding here is wholly *sui generis* to the facts of this case.

The instruction given by the trial court tracked the language of our standard jury instruction on aiding and abetting,[9] and essentially included the elements set forth by Professor Perkins.[10]

██ Our aiding and abetting statute does not differ substantially from its federal counterpart.[11] Each provides that an aider and abettor may be indicted, tried and convicted as a principal. *Jin Fuey Moy v. United States*, 254 U.S. 189, 41 S.Ct. 98, 65 L.Ed. 214 (1920); *Nye & Nissen v. United States*, 336 U.S. 613, 620, 69 S.Ct. 766, 93 L.Ed. 919 (1949); *United States v. Knickerbocker Fur Coat Co.*, 66 F.2d 388, 390 (2d Cir. 1933); *Colbeck v. United States*, 10 F.2d 401, 403 (7th Cir. 1926). As we said in *Creek v. United States*, D.C.App., 324 A.2d 688, 689 (1974), quoting from *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (Hand, J.):

> Aiding and abetting is established if the accused " . . . in some sort associated himself with the venture . . . participated in it as in something that he wished to bring about, [and] . . . [sought] by his action to make it succeed."

See *Nye & Nissen v. United States, supra*, 336 U.S. at 619, 69 S.Ct. 766; *United States v. Clayborne*, 166 U.S.App.D.C. 140, 148, 509 F.2d 473, 481 (1974); *United States v. Lumpkin*, 145 U.S.App.D.C. 162, 167, 448 F.2d 1085, 1090 (1971). Thus, although there must exist a community of unlawful intent between the accessory and the perpetrator of the crime:

> It is well settled . . . that he need not necessarily have intended the particular crime committed by the principal; an accessory is liable for any criminal act which in the ordinary course of things was the natural or probable consequence of the crime that he advised or commanded, although such consequence may not have been intended by him. [22 C.J.S. *Criminal Law* § 92 at 164 (1961).]

See *United States v. Clayborne, supra*, 166 U.S.App.D.C. at 148, 509 F.2d at 481; *United States v. DeLa Motte*, 434 F.2d 289, 293 (2d Cir. 1970), *cert. denied*, 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971).

██ In the instant case, the murders of Theodore Moore and Yale Harris were the natural consequence of appellant's actions since he participated in the commission of

---

**9.** *See* Criminal Jury Instructions for the District of Columbia, No. 4.02 (2d ed. 1972).

**10.** The court charged the jury with regard to the law on aiding and abetting as follows:

> Now, the Government, in presenting its case, relies, in part, on what the prosecutor has called the doctrine of aiding and abetting and I charge you, as a matter of law, that you may find the defendant guilty of the crime charged in the indictment without finding that he personally committed each of the acts constituting the offense or that he was personally present at the commission of the offense. Any person who advises, incites or connives at an offense, or aids or abets the principal offender, is punishable as a principal. That is, he is as guilty of the offense as if he had personally committed each of the acts constituting the offense.
>
> A person aids and abets another in the commission of a crime if he knowingly associates himself in some way with the criminal venture, with the intent to commit the crime, participates in it as something he wishes to bring about, and seeks by some action of his to make it succeed.

> Some conduct by the defendant of an affirmative character in furtherance of a common criminal design or purpose is necessary. Mere physical presence by the defendant at the time and place of the commission of an offense is not by itself sufficient to establish his guilt. It is not necessary that any specific time or mode of committing the offense shall have been advised or commanded, or that it shall have been committed in the particular way instigated or agreed upon. Nor is it necessary that there shall have been any direct communication between the actual perpetrator and the defendant.

**11.** *See* 18 U.S.C. § 2 (1970).

> D.C.Code 1973, § 22–105 provides:
>
> In prosecutions for any criminal offense all persons advising, inciting, or conniving at the offense, or aiding or abetting the principal offender, shall be charged as principals and not as accessories, the intent of this section being that as to all accessories before the fact the law heretofore applicable in cases of misdemeanor only shall apply to all crimes, whatever the punishment may be.

both murders from their inception through their conclusion. Moreover, the evidence was more than sufficient to support a finding that appellant knew that Willie Strickland had the specific intent to kill both Yale Harris and Theodore Moore. In this respect, the government's evidence is significant. On the evening of February 12, 1973, appellant, Martin, and Strickland were parked in a car when Theodore Moore approached and asked them if they knew the whereabouts of Michael White. Strickland offered to take Moore to White. Before Moore sat down in the back seat of the car, Strickland told Martin that Moore was his "hit." Martin understood from this that Strickland wanted him to kill Moore. Appellant drove all of them to Pride Rodent Control Center, where he worked. He unlocked the front door, went inside, and let the others in through the rear. While Moore was smoking a cigarette in the back room of the Pride building, Martin struck him with a board. Strickland then hit Moore with another board, and appellant struck Moore with a shovel. Appellant and Martin then each shot into Moore's face with separate guns. After Moore was beaten and shot, appellant and Martin bound Moore's legs. Appellant then suggested that the body be discarded near Culpeper, Virginia, and the trio stuffed Moore's body into the trunk of the car. They drove to Virginia but appellant and Martin dumped the body down an embankment before reaching Culpeper.

On the morning of February 13, 1973, appellant, Strickland, and Martin were seated in the same car used the previous day in the Moore murder. Yale Harris made the mistake of approaching the car to ask if they had seen Michael White. Strickland agreed to take Harris to White, and Harris got into the car. Once again, just as on the previous evening with Moore, the trio headed toward the Pride Rodent Control Center on U Street, N.W. Once inside, Strickland

called appellant and Martin out of the room and instructed them to draw their guns on Harris. Both men complied with Strickland's order. Appellant explained to Harris that he had spoken with White and that White had claimed he did not know Harris. Furthermore, according to appellant, White suspected that Harris might be a "hit man" whom they were to hold until White arrived. With the same type of cord used to bind Moore, Martin tied Harris' feet while appellant secured his hands.

Offering to help Harris to sit down on a green couch, Strickland positioned himself behind Harris; but instead of assisting, he began choking Harris. Appellant began beating Harris on the chest and stomach with a steel clamp, while Strickland continued to choke him. Appellant and Strickland then dunked Harris' head into a sink full of water. Since it was still daylight, Harris' body was secreted inside the green couch, after the seat was lifted out and one of its boards was broken with the clamp, until nighttime. A few days later, appellant told Martin that he had put Harris' body in an alley behind the Pride building.

The evidence is convincing that appellant was present and participated in the murders. In a practical sense, each of the three killers was an aider and abettor, because the evidence tended to prove that appellant and his companions all committed overt acts which caused the deaths of Theodore Moore and Yale Harris. Furthermore, the evidence clearly supported an instruction on first-degree murder. Appellant does not contend an absence of premeditation and deliberation on his part. Jury instructions should be considered as a whole, rather than dealing with parts taken out of context. *See Suggs v. United States,* 132 U.S. App.D.C. 337, 342, 407 F.2d 1272, 1277 (1969). Hence, even though the evidence tended to prove that appellant was the actual killer,[12] it was not inconsistent or misleading for the trial court to instruct on the

---

12. The Deputy Chief Medical Examiner in charge of the Northern Virginia Division of the

Virginia Office of the Chief Medical Examiner performed an autopsy on Theodore Moore's

theory that appellant was an aider and abettor as well as the actual killer because the greater participation in the offense includes the lesser and the legal effect is the same.

On the record before us the instruction did not impose a greater or different responsibility than justified by the law and the evidence. The aiding and abetting instruction may have been both vague and superfluous in a first-degree murder context, but we conclude that the appellant could not have been prejudiced by it. Without a more specific proposed instruction from counsel, we are constrained to hold that the instruction as given by the trial court was proper.

## V

 Appellant claims that he was denied a fair trial because the trial court refused to sever the three homicide counts against him and to order separate trials on each charge.[13] We disagree. D.C.Code 1973, § 23–311(a), permits the joinder of two or more offenses when each is charged in a separate count of the indictment, if such offenses "are of the same or similar character . . . ." Moreover, Super.Ct.Cr.R. 8(a) permits joinder for trial of offenses if they are of similar character, or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan.[14] *Arnold v. United States,*

D.C.App., 358 A.2d 335, 338 (1976) (en banc); *Goins v. United States,* D.C.App., 353 A.2d 298, 300 (1976); *Coleman v. United States,* D.C.App., 298 A.2d 40, 42 (1972), *cert. denied,* 413 U.S. 921, 93 S.Ct. 3070, 37 L.Ed.2d 1043 (1973); *Drew v. United States,* 118 U.S.App.D.C. 11, 14, 331 F.2d 85, 88 (1964). Since the offenses here were tried together over appellant's timely and specific objection, the question on review is "whether the trial record manifests a sufficient possibility of undue prejudice by reason of such joinder to indicate an abuse of discretion by the trial judge." *Bridges v. United States,* D.C.App., 381 A.2d 1073, 1074–75 (1977). *See Calhoun v. United States,* D.C.App., 369 A.2d 605, 608 (1977); *Coleman v. United States, supra* at 42. This court has found no prejudicial joinder and upheld the denial of a motion for severance (1) where the evidence as to each crime is simple and distinct and therefore the jury is not likely to draw conclusions of guilt for one offense from the evidence presented on another; and (2) where the evidence as to each offense would be admissible in a separate trial for the other offense. *See Bridges v. United States, supra* at 1075; *Tinsley v. United States,* D.C.App., 368 A.2d 531 (1976); *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964). In the instant case, evidence of all the charges against appellant would have been mutually admissible at each of the separate trials had the severance motion been granted.

body and concluded that the cause of death was a penetrating gunshot wound to the head. The Deputy Medical Examiner of the District of Columbia determined that Yale Harris' cause of death was asphyxiation and hemorrhage due to strangulation, bruising of the heart and laceration of the liver. The doctor testified that in his opinion the iron clamp which appellant was said to have used to beat Harris could have inflicted the chest injury. Hence, appellant's actions in both cases could easily be said to have been fatal to the murder victims.

13. Appellant filed a pretrial severance motion based upon Super.Ct.Cr.R. 14, which provides in pertinent part:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or

information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. . . .

14. Super.Ct.Cr.R. 8(a) provides:

*Joinder of Offenses.* Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

■ It is well settled that evidence involving other crimes may be admitted to prove motive, intent, identity, the existence of a common scheme or plan, or the absence of inadvertence, accident or mistake. *Day v. United States*, D.C.App., 360 A.2d 483 (1976); *Drew v. United States, supra,* 118 U.S.App.D.C. at 16, 331 F.2d at 90. *See* McCormick, Handbook of the Law of Evidence § 190 (2d ed. 1972). On the facts of the case at bar, the evidence shows the existence of a common scheme or plan. The trial court's ruling was based on the undisputed government proffer that the three homicides charged in counts III, IV and VII of the indictment were all committed to conceal the facts surrounding the death of Charles Coleman.[15] To be sure, Jesse Martin testified that Willie Strickland wanted no witnesses to the Coleman slaying. Strickland feared that Michael White's girl friend, Brenda Green-el, knew too much about the Coleman murder and ordered White to kill her. When White refused, he too became suspect and was killed. Yale Harris and Theodore Moore were killed when they inquired as to White's whereabouts. Hence, what emerges is an on-going plan to cover up the facts of the original murder in which Willie Strickland was charged with killing Charles Coleman. This cover-up escalated, with the murders of Harris and Moore, to conceal even those facts which would indirectly reveal the perpetrators of the Coleman homicide.

Appellant alternatively contends that even if some of the evidence of all three murder counts would have been mutually admissible at separate trials, certain physical and testimonial evidence which was admitted at trial,[16] did not meet the standards

of reciprocal admissibility enunciated in *Drew v. United States, supra.* He urges that the cumulative effect of this evidence was so prejudicial as to outweigh the advantages of joinder. We disagree.

■ Appellant reads the *Drew* standard too narrowly. As the federal court of appeals for our circuit stated in *Bradley v. United States*, 140 U.S.App.D.C. 7, 12, 433 F.2d 1113, 1118 (1969):

> [W]here evidence of joined offenses would be mutually admissible in separate trials of those offenses, severance is not ordinarily required on account of "criminal propensity" prejudice. And this precept "does not require that every item of evidence relating to one offense be admissible in a separate trial for the other, but rather looks in a broader sense to whether the rules relating to 'other crimes' evidence have been satisfied. [*Quoting Baker v. United States*, 131 U.S. App.D.C. 7, 24, 401 F.2d 958, 975 (1968), *cert. denied*, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970) (footnotes omitted).]

■ Hence, the existence here of a cover-up scheme was enough to render the evidence in question admissible at the joint trial below. We find no abuse of discretion in the trial court's decision. There was a definite relationship between the joined offenses making evidence of each mutually admissible at separate trials had the counts been severed. Moreover, the degree of prejudice to appellant, if any, was outweighed by considerations of economy and expedited judicial administration. *See Goins v. United States, supra* at 300. We conclude, therefore, that the trial court's

---

**15.** To summarize, Charles Coleman was killed by Willie Strickland and Michael White because Coleman had robbed White of some narcotics.

**16.** The evidence in question was a curtain rod used in the Moore killing, photographs of Moore's corpse and testimony concerning Moore's wounds. Appellant contends that

these would be inadmissible in a separate trial on the Harris murder. Conversely, appellant also argues that the admission of a religious pendant, large metal c-clamp, pictures of Harris' corpse and testimony concerning Harris' wounds would not be admissible in a separate trial of the Moore murder count.

denial of appellant's motion to sever the counts against him was proper.

The judgments of conviction on appeal are

*Affirmed.*